**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| FRANCES E. GARRETT, | : | Civ. No. 05-597 (GEB) |
|  | : |  |
| Plaintiff, | : |  |
|  | : | **MEMORANDUM OPINION** |
| v. | : |  |
|  | : |  |
| COMMISSIONER OF SOCIAL | : |  |
| SECURITY, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

**BROWN, Chief Judge**

This matter comes before the Court upon the appeal of plaintiff Frances E. Garrett ("Plaintiff") from the Commissioner of Social Security's ("Commissioner") final decision that Plaintiff was not entitled to disability insurance benefits under the Social Security Act ("the Act"). The Court, exercising jurisdiction pursuant to 42 U.S.C. § 405(g), and having considered the parties' submissions without oral argument pursuant to Federal Rules of Civil Procedure Rule 78, will deny Plaintiff's appeal.

## I.    BACKGROUND

On or about September 3, 2002, Plaintiff filed an application for disability insurance and supplemental security income pursuant to Title II and Part A of Title XVIII of the Act. (Record ("R.") at 11, 105.) After her application was denied both initially and on reconsideration, Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (R. at

11.)  Plaintiff's hearing occurred on June 7, 2004, and was conducted by ALJ Gerald Ryan.  (R. at 11, 21.)  On July 3, 2004, the ALJ issued his decision denying Plaintiff's application for benefits.  (R. at 8.)  On or about July 15, 2004, Plaintiff filed a request for review of the ALJ's denial by the Appeals Council.  (R. at 6-7.)  The Appeals Council denied Plaintiff's request on December 3, 2004.  (R. at 3.)

### A.    The ALJ Decision and the Objective Medical Records Discussed in the Decision

In his decision, the ALJ discussed a number of medical reports from several doctors, including Drs. Donald, Nkwonta, Bram, and Daknis, dated between February 2001 and March 2004.  Those reports describe the following facts.

### 1.    Dr. Donald's Medical Examinations Dated February 2, 2001, August 16, 2001, and December 27, 2001

In his review of the medical evidence, the ALJ discussed a number of reports by Dr. Donald, including his report dated February 2, 2001.  (R. at 13, 181.)  In that report, Dr. Donald stated that Plaintiff was 5 feet 5 inches in height, and that she weighed 121 pounds.  (R. at 181.)  Plaintiff was in "mild obvious discomfort" and "move[d] somewhat slowly and cautiously."  (*Id.*)  Dr. Donald observed that Plaintiff had positive interscapular pain, and that Valsalva did not increase her symptoms.  (*Id.*)  Dr. Donald further observed that "[c]ervical spine demonstrate[d] bilateral lower paracervical tenderness and medial trapezial tenderness bilaterally with mild paraspinal and trapezial spasm."  (*Id.*)  According to Dr. Donald, Plaintiff "ha[d] near full flexion of the cervical spine with neck pain, limited extension and rotation secondary to increased neck

pain radiating across the tops of her shoulders." (*Id*.)  Dr. Donald further observed that Plaintiff "ha[d] negative Spurling sign," and that she "ha[d] no thoracic paraspinal tenderness or spasm [and] no thoracic cage tenderness." (*Id*.)  Dr. Donald observed that Plaintiff "ha[d] obvious right thoracic left lumbar scoliosis." (*Id*.)  Plaintiff's "[l]umbar spine demonstrate[d] bilateral lumbosacral paraspinal tenderness with mild gluteal tenderness" and "[n]o sciatic notch tenderness." (R. at 182.)  "Forward flexion of low back [was] limited to approximately 70 degrees with low back pain" and "extension [was] to 10 degrees with increased low back pain." (*Id*.)  Plaintiff's "[s]ide bending [was] reasonably good," and "[n]eurologic examination of both upper and lower extremities including motor, sensory, and deep tendon reflexes [were] all normal throughout." (*Id*.)  "Hoffman testing [was] negative," Plaintiff "ha[d] no ankle clonus," and "[t]oes [were] downgoing to Babinski testing." (*Id*.)  Plaintiff's "[h]ip rotation [was] full, nonpainful," "Fabere testing [was] negative bilaterally," and "[s]traight leg raising [was] negative for radicular symptoms." (*Id*.)  Dr. Donald indicated that Plaintiff had no radiation down her arms or legs, but that she would drop things from her right arm. (R. at 181.)  Plaintiff's "[u]pper and lower extremities including the elbows, wrists, hips, knees, and ankles [were] all without swelling and nontender with full active range of motion," and "[p]edal pulses [were] palpably intact." (R. at 182.)

In discussing Plaintiff's x-rays and imaging results, Dr. Donald observed that "AP and lateral x-rays of the cervical spine . . . appeared to be essentially normal with well preserved disc spaces and normal cervical lordosis." (*Id*.)  "AP and lateral x-rays of the lumbar spine demonstrate[d] left scoliosis with no evidence of spondylolisthesis, spondylolysis, or fracture." (*Id.*)  Dr. Donald found that Plaintiff "ha[d] a sub-acute cervical and lumbar strain," but that

3

"[n]eurologically, she [was] normal." (*Id*.)  Dr. Donald prescribed "an aggressive course of physical therapy." (*Id*.)

The ALJ also discussed a number of Dr. Donald's subsequent reports concerning Plaintiff's condition.  (R. at 13.)  On August 16, 2001, Dr. Donald reported that Plaintiff "continue[d] to have neck and low back pain, which are all mechanical and axial in nature," and that "she [was] improving at a progressive rate in physical therapy." (R. at 188.)  After reviewing Plaintiff's physical therapy notes, Dr. Donald found that "she [was] clearly making objective as well as subjective improvement in her symptoms, with such a treatment program." (*Id*.)  According to Dr. Donald, Plaintiff "continue[d] to have mild bilateral lumbosacral paraspinal tenderness and trapezial lower paraspinal cervical tenderness bilaterally." (*Id*.)  Dr. Donald further found that "[n]eurologically, [Plaintiff] [was] intact." (*Id*.)  Dr. Donald prescribed 4-6 more weeks of physical therapy, "graduated to an independent program she can manage on her own . . . ." (*Id*.)

The ALJ also referred to Dr. Donald's report dated December 27, 2001.  (R. at 14.)  Plaintiff had completed physical therapy about two weeks before the examination.  (R. at 189.)  Dr. Donald observed that Plaintiff was "mildly improved with her physical therapy, but symptoms [did] continue with mechanical axial neck pain and trapezial spasms." (*Id*.)  "Her low back pain continue[d], but her neck pain [was] much greater than her low back pain." (*Id*.)  Dr. Donald observed that Plaintiff's symptoms were "significantly better related." (*Id*.)  Upon physical examination, Dr. Donald found that Plaintiff had "positive midline lower cervical and bilateral trapezial tenderness with mild spasm,' and that she had "positive bilateral lumbosacral paraspinal tenderness and left lumbar scoliosis." (*Id*.)  "Neurovascularly, she [was] intact in both

4

upper and lower extremities." (*Id*.)

Dr. Donald found that Plaintiff "continue[d] to have residual symptoms of cervical and lumbosacral strain, although much improved from her initial pretreatment symptoms." (*Id*.) According to Dr. Donald, "[t]hese residual symptoms remain[ed] markedly limiting with activity tolerance," and he expected them "to be permanent." (*Id*.) Dr. Donald recommended "an independent exercise/gym program that she manages on her own," and expressed an interest in seeing Plaintiff again after three months for reexamination. (*Id*.)

### 2.    Dr. Nkwonta's Medical Examination Dated October 23, 2002

The ALJ also discussed an internal medical examination conducted by Dr. Nkwonta on October 23, 2002. (R. at 14-15.) The examination was requested by the Disability Determination Services. (R. at 14.) Dr. Nkwonta observed that "neck pain radiate[d] to [Plaintiff's] shoulder and upper back," and that "[p]ain in lower back [was] non-radiating." (R. at 166.) According to Dr. Nkwonta, "[t]he pain [was] aggravated by cold, damp weather, prolonged sitting more than half an hour, and prolonged standing more than half an hour." (*Id*.) At the time, Plaintiff "use[d] Glucosamine, Chondroitin daily and Advil 4-6 tablets a week for pain." (*Id*.) Plaintiff had undergone physical therapy for three months, and performed back muscle-strengthening exercises. (*Id*.) In describing Plaintiff's daily activities, Dr. Nkwonta stated that she cooked, did limited cleaning and laundry, shopped for food and clothing, showered, and dressed herself. (*Id*.)

According to Dr. Nkwonta, Plaintiff appeared to be in no acute distress. (R. at 167.) Plaintiff's gait was normal, she could walk on heels and toes without difficulty, and her stance

was normal.  (*Id.*)  Plaintiff's squat was full, and she did not require assistive devices.  (*Id.*)

Plaintiff did not need help changing for the examination, getting on and off the examination

table, or rising from the chair.  (*Id.*)

Upon examination of Plaintiff, Dr. Nkwonta found "[c]ervical spine flexion 30 degrees,

extension 40 degrees, rotation 60 degrees of both sides, and lateral flexion 30 degrees both

sides."  (R. at 167-68.)  Dr. Nkwonta observed no spasm, but did observe "some point pain."  (R.

at 168.)  Dr. Nkwonta further found "[n]o scoliosis or kyphosis or abnormality in the thoracic

spine."  (*Id.*)  According to Dr. Nkwonta, "[l]umbar spine show[ed] full flexion, extension,

lateral flexion, and full rotary movement bilaterally."  (*Id.*)  Dr. Nkwonta further observed

"[s]traight leg raising negative bilaterally," and "[f]ull range of motion of shoulders, elbows,

forearms, and wrists bilaterally," as well as "[f]ull range of motion of hips, knees, and ankles

bilaterally."  (*Id.*)  Dr. Nkwonta also found "[s]trength 5/5 in the upper and lower extremities."

(*Id.*)  According to Dr. Nkwonta, there were "[n]o evident subluxations, contractures, ankylosis,

or thickening."  (*Id.*)  Plaintiff's "[j]oints [were] stable and nontender," and there was "[n]o

redness, heat, swelling, or effusion."  (*Id.*)

Dr. Nkwonta found "[n]o cyanosis, clubbing, or edema," and that "[p]ulses [were]

physiologic and equal."  (*Id.*)  Dr. Nkwonta also found "[n]o significant varicosities or trophic

changes," and that "[n]o muscle atrophy [was] evident."  (*Id.*)

Dr. Nkwonta's diagnoses consisted of neck pain and low back pain syndrome.  (*Id.*)

According to Dr. Nkwonta, Plaintiff was "moderately restricted in activities requiring heavy

lifting, prolonged standing and sitting due to the neck, cervical, and lumbar pain."  (*Id.*)

### 3.     Additional Medical Examinations By Dr. Donald Dated November 20, 2002 and April 24, 2003

The ALJ referred to additional reports by Dr. Donald.  (R. at 15.)  On November 20, 2002, Dr. Donald observed that Plaintiff was "complaining of headaches greater than her neck pain," and that the headaches occurred "two to three times a week" and were "very debilitating." (R. at 217.)  Plaintiff described the pain as "radiating from behind her head to the front, to her forehead, and moving towards the temple region."  (*Id.*)  Plaintiff also complained that "her right knee ha[d] been troubling her . . . ."  (*Id.*)

Upon physical examination, Dr. Donald found that Plaintiff "ambulate[d] without a limp," and that "[h]er cervical spine ha[d] good ROM with positive spinous process tenderness." (*Id.*)  Dr. Donald found "[n]egative paraspinal tenderness" and "[p]ositive trap tenderness with spasms bilaterally."  (*Id.*)  According to Dr. Donald, Plaintiff's "thoracic spine [was] clinically straight," her "lumbosacral spine ha[d] full range of motion without any tenderness," her "shoulders ha[d] full range of motion without any pain," her "knees [had] full ROM bilaterally," and her "right knee [was] without any ecchymoses or swelling."  (*Id.*)  Dr. Donald further found "[n]egative McMurrays's" and "no pain either to varus or valgus stress to [Plaintiff's] right knee."  (*Id.*)  Dr. Donald observed that Plaintiff's strength was "5/5 in the upper and lower extremities bilaterally," that her "deep tendon reflexes [were] 2+ in the upper and lower extremities bilaterally," and that sensation was "intact to light touch."  (*Id.*)  According to Dr. Donald, "[t]he patient ha[d] a negative straight leg raise bilaterally."  (*Id.*)

Dr. Donald found that Plaintiff was "suffering from cervical sprain/strain and headaches." (*Id.*)  He was unsure as to whether the headaches were cervicogenic or migraines.  (*Id.*)  Dr.

7

Donald referred Plaintiff for neural examination, and prescribed Skelaxin 400 m.g. for her

spasms, and that she continue with a home exercise program.  (*Id*.)

Dr. Donald again examined Plaintiff on April 24, 2003.  (R. at 15.)  He observed that

Plaintiff "continue[d] to complain of mechanical axial neck pain."  (R. at 215.)  Dr. Donald

found that "MRI demonstrate[d] no significant neural compression or disc herniation," but that

Plaintiff "ha[d] significant degenerative changes."  (*Id*.)  He determined that Plaintiff's

"symptoms [were] consistent with chronic discogenic pain," and prescribed "provocative

discography to more clearly delineate the structural pathology" before reevaluation.  (*Id*.)

### 4.    Dr. Bram's Medical Examination Dated May 13, 2003

The ALJ also referred to a medical report by Dr. Bram, a board-certified pain

management specialist.  (R. at 16.)  Dr. Bram examined Plaintiff on May 13, 2003.  (R. at 204.)

Dr. Bram observed that Plaintiff "complain[ed] of non-radicular neck pain, which [was]

exacerbated with activity along with walking, standing, sitting, and even lying down."  (*Id*.)

According to Dr. Bram, Plaintiff "denie[d] any right upper extremity symptoms," and "[t]here

[was] no change in Valsalva maneuvers."  (*Id*.)  Plaintiff "also complain[ed] of low back pain

and most recently began experiencing some discomfort in her left lower extremity . . . ."  (*Id*.)

Dr. Bram made a number of findings concerning Plaintiff's lumbar and cervical spine.

He reported that "[a] cervical MRI from 04/15/2003 showed [] mild facet changes along with

discogenic changes, currently noted at C5-6, C6-7," and that a "[l]umber MRI showed mild-to-

moderate disc bulge at L4-5 . . . ."  (R. at 204.)  Dr. Bram found that Plaintiff had "[n]ormal

lumbar lordosis" and "[n]ormal cervical lordosis[.]"  (R. at 205.)  Dr. Bram also found that she

had no tenderness, spasms, or masses with respect to palpation.  (*Id*.)  Plaintiff's motor skills

were found to be "[g]rossly within normal limits, no wasting noted, muscle tone normal."  (*Id*.)

Dr. Bram observed that, with respect to her neck, Plaintiff could "flex and extend bilaterally,

[and] [could] rotate the neck."  (*Id*.)  Dr. Bram found that "[t]here [was] no lumbar paraspinous

muscle spasm," "[n]o piriformis sinus tenderness," "[n]o pain on straight leg raise, [and] no

lower extremity edema noted."  (*Id*.)  Dr. Bram's neurological findings included "[m]otor 5/5

bilaterally," "[s]ensory intact to pinprick and light touch," and "[r]eflex symmetrical."  (R. at

206.)


### 5.      Dr. Donald's Medical Examination Dated August 6, 2003

On August 6, 2003, Dr. Donald again examined Plaintiff.  (R. at 16.)  Plaintiff had

complained of "persistent mechanical axial neck pain radiating up the occipital region and across

her shoulders."  (R. at 214.)  According to Dr. Donald, Plaintiff "had a provocative discography

done, which demonstrated concordant reproduction of pain at the C3-4 level with no pain or

discomfort at C4-5, C6-7, or T1."  (*Id*.)  Plaintiff "maintained good disc space height and

structural integrity of the discs," and "[was] a good candidate for consideration of intradiscal

interventional pain management procedures . . . ."  (*Id*.)  Dr. Donald planned to refer Plaintiff to

Dr. Daknis for such procedures.  (*Id*.)  Dr. Donald stated that Plaintiff "also ha[d] the new onset

the last couple of weeks of right shoulder pain with loss of motion, which has been increasing for

her."  (*Id*.)

Upon physical examination, Dr. Donald found that Plaintiff "[had] decreased passive

range of motion of the right shoulder, especially in internal and external rotation and forward

flexion." (*Id.*)  Plaintiff "internally rotate[d] to her buttock, externally rotate[d] to 5 degrees, and forward flexe[d] to 145 degrees."  (*Id.*)  Dr. Donald found these observations to be "consistent with adhesive capsulitis," and prescribed "physical therapy for early and aggressive treatment of this." (*Id.*)  Dr. Donald stated that he would see Plaintiff after "her pain management for her chronic cervical discogenic pain . . . ."  (*Id.*)

### 6.    Dr. Daknis's Medical Examination Dated November 17, 2003

The ALJ also discussed medical findings by Dr. Daknis.  (R. at 16.)  On November 17, 2003, Dr. Daknis reported that Plaintiff complained about pain in her right shoulder, as well as "marked limitation of range of motion, passive as well as active."  (R. at 210.)  Upon review of Plaintiff's patient history and review of systems, Dr. Daknis found no changes in Plaintiff.  (*Id.*)  According to Dr. Daknis, Plaintiff "ha[d] positive cervical discogram at C3-C4" and "[h]er cervical spine [was] negative."  (*Id.*)  Dr. Daknis prescribed further evaluation for adhesive capsulitis, and follow-up with Dr. Donald "for possible discogenic workup and surgery."  (*Id.*)  Dr. Daknis also prescribed pain medications "for episodes of adhesive capsulitis in the form of Vicodin."  (*Id.*)

### 7.    Dr. Donald's Medical Report Dated March 3, 2004

The ALJ referred in his decision to a letter by Dr. Donald dated March 3, 2004.  (R. at 16-17.)  In that letter, Dr. Donald stated that Plaintiff was "cared for by myself for chronic cervical and lumbosacral strain [causally] related to trauma sustained during her motor vehicle accident on November 3, 2000."  (R. at 211.)  According to Dr. Donald, "[b]ecause of progression of

these symptoms, she has remained out of work now since February 2, 2001," and that "I would expect these symptoms and her disability to be relatively permanent in nature for her." (*Id*.)

### B.      The ALJ Hearing

On June 7, 2004, the ALJ conducted a hearing to determine whether Plaintiff qualified for disability benefits. (R. at 22.) In attendance were Plaintiff, her husband, and Plaintiff's counsel. (R. at 11.) Plaintiff testified that she was 47 years old at the time of the hearing, and that she was married and lived with her spouse. (R. at 26.) Plaintiff had received a high school education. (*Id*.) Plaintiff testified that her limitations resulted from injuries that she sustained during a motor vehicle accident. (R. at 27.)

### 1.      Plaintiff's Testimony Concerning Her Previous Work Experiences

Plaintiff testified that she last worked on November 3, 2000. (R. at 28.) She was employed at a day care center where she had worked for three months. (*Id*.) Plaintiff stated that she stopped working as a result of the car accident that gave rise to her alleged disability. (R. at 28-29.)

Prior to her work at the day care center, Plaintiff had a job performing data entry and clerical office work. (R. at 29.) That job, which lasted approximately 9 months, involved sitting at a computer, as well as standing to perform such tasks as filing and copying. (*Id*.) Before her data entry job, Plaintiff had worked at a church doing secretarial work. (R. at 29-30.) Plaintiff held that job for "over a year." (R. at 30.) Prior to the job at the church, Plaintiff had been employed by an office to perform accounts payable and computer work. (*Id*.) She held that job

11

for "over two years." (*Id.*)  The job involved computer data entry and making telephone calls to various people.  (R. at 31.)  Plaintiff testified that each of her office jobs involved sitting at a desk for extended periods.  (R. at 57.)  Plaintiff stated that if she had a similar office job, she would have to alternate standing and sitting every 10 to 15 minutes.  (R. at 58.)

### 2.      Plaintiff's Testimony Concerning Her Daily Activities

Plaintiff also described the daily activities that she was able to perform.  According to Plaintiff, she could cook, wash dishes, make her bed, and do laundry.  (R. at 32-33.)  Plaintiff stated that she was unable to sweep, mop, vacuum, or clean the bathroom or kitchen.  (R. at 33.)  Plaintiff testified that she would drive approximately four times a week to buy groceries, and would also drive to perform other errands, including going to the pharmacy, bank, and post office.  (R. at 33-34.)  Plaintiff also stated that she would take daily walks lasting approximately 15 to 30 minutes, at the recommendation of her doctor, for the purpose of strengthening her back muscles.  (R. at 35.)  According to Plaintiff, she could use a computer for no longer than 10 to 15 minutes, but would then need to stand up and move around for a little while.  (R. at 55.)

### 3.      Plaintiff's Testimony Concerning Her Limitations

Plaintiff testified that she suffered from pain and muscle spasms in her neck, shoulders, back, and right arm.  (R. at 27-28, 40.)  She stated that she could stand for no longer than approximately 10 to 15 minutes at a time.  (R. at 28.)  According to Plaintiff, she had problems with repetitive tasks.  (*Id.*)  Plaintiff further testified that she could not lift more than 2 to 5 pounds.  (R. at 28, 35.)

12

According to Plaintiff, she had trouble grasping things in either hand, and that she could not extend her arms straight up in the air or straight out in front of her.  (R. at 36.)  She was not, however, getting any medical treatment for the problems in her arms.  (*Id*.)  Plaintiff also testified that she suffered from migraines that occurred about 3 to 4 times a week, lasting between 5 and 8 hours.  (R. at 37, 52.)  She was also not receiving medical treatment for her migraines.  (R. at 37.)  Plaintiff testified that she was "very depressed," but had not sought any medical treatment for that problem.  (R. at 55.)  Plaintiff stated that during the time beginning 2001 through 2004, she was never hospitalized or sent to the emergency room.  (R. at 69-70.)

Plaintiff described the medications that she was taking at the time.  (R. at 31.)  Plaintiff testified that her medications consisted of Advil and Excedrin, as well as calcium and glycocyamine.  (R. at 31-32.)  According to Plaintiff, her medications were all non-prescription.  (*Id*.)  Plaintiff stated that the medications resulted in headaches, blurred vision, and dizziness.  (R. at 32.)

## C.    The Present Action

Plaintiff filed the complaint in the present action on January 28, 2005.  Plaintiff argues that she is entitled to benefits or, alternatively, to a new hearing concerning her eligibility.  (Pl.'s Br. 28-29.)  Briefing having been completed by the parties, the Court will now consider Plaintiff's appeal.

## II.     DISCUSSION

### A.     Standard of Review for Social Security Appeals

The Commissioner's decisions as to questions of fact are conclusive before a reviewing court if they are supported by "substantial evidence" in the record.  42 U.S.C. § 405(g); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate."  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations omitted).  If the ALJ's findings of fact are supported by substantial evidence, this Court is bound by those findings, "even if [it] would have decided the factual inquiry differently."  *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) (citation omitted).

The Third Circuit Court of Appeals has made it clear "that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence."  *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) (emphasis in original).  The ALJ must analyze all the evidence and explain the weight he has given to probative exhibits.  *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978).  The Third Circuit Court of Appeals has held that access to the ALJ's reasoning is indeed essential to a meaningful court review.  *Fargnoli,* 247 F.3d at 42.  Nevertheless, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  *Williams v. Sullivan,* 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted).

**B.      Standard for Awarding Benefits**

A claimant may not receive benefits under the Act unless he or she first meets statutory

insured status requirements.  A claimant must be disabled, which is defined as the "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C.

§ 423(d)(1)(A).  An individual is not under a disability unless "his physical or mental impairment

or impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy, regardless of whether such work exists in the

immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he

would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).

Regulations promulgated under the Act establish a five-step process for an ALJ's

evaluation of a claimant's disability.  20 C.F.R. § 404.1520.  In the first step, the ALJ must

determine whether the claimant is currently engaged in "substantial gainful activity."  20 C.F.R.

§ 404.1520(a)(4)(i).  If the claimant is working and the work is a substantial gainful activity, his

application for disability benefits is automatically denied.  *Id.*  If the claimant is not employed, the

ALJ proceeds to step two and determines whether the claimant has a severe impairment or

combination of impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  A claimant who does not have a

severe impairment is not disabled.  *Id.*  Third, if the impairment is found to be severe, the ALJ

determines whether the impairment meets or is equal to those impairments listed in Appendix 1,

Subpart P of 20 C.F.R. Part 404.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is

conclusively presumed to be disabled, and the evaluation ends.  20 C.F.R. § 404.1520(d).  The third step must be more than a conclusory statement – the ALJ must discuss the evidence presented and include an analysis of whether and why the claimant's impairments, or those impairments combined, are or are not equivalent in severity to one of the listed impairments. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000).

If it is determined that the impairments do not meet or equal a listed impairment, the ALJ proceeds to step four, which requires a determination of:  (1) the claimant's capabilities despite limitations imposed by an impairment (i.e., RFC); and (2) whether those limitations prevent the claimant from returning to work performed in the past.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant is found capable of performing his previous work, the claimant is not disabled.  *Id.*  If the claimant is no longer able to perform his prior line of work, the evaluation must continue to the last step.  The fifth step requires a determination of whether the claimant is capable of adjusting to other work available in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  The ALJ must consider the claimant's RFC, together with his age, education, and past work experience.  20 C.F.R. § 404.1520(g).  Thus, entitlement to benefits turns on a finding that the claimant is incapable of performing his past work or some other type of work in the national economy because of his impairments.

The application of these standards involves shifting burdens of proof.  The claimant has the burden of demonstrating both steps one and two, i.e., an absence of present employment and the existence of a medically severe impairment.  *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant is unable to meet this burden, the process ends, and the claimant does not receive benefits.  *Id.*  If the claimant carries the burden and demonstrates that the impairments meet or

16

equal those within the Listing, he satisfies his burden of proof and is automatically entitled to benefits. *Id.* If the claimant is not conclusively disabled under the criteria set forth in the Listing, step three is not satisfied, and the claimant must prove "at step four that the impairment prevents him from performing his past work." *Id.* Thus, it is the claimant's duty to offer evidence of the physical and mental demands of past work and explain why he is unable to perform such work. If the claimant meets this burden, the burden of proof then shifts to the Commissioner to show, at step five, that the claimant is "able to perform work available in the national economy." *Id.* The step five analysis "can be quite fact specific." *Burnett*, 220 F.3d at 126.

### C.   Plaintiff's Appeal

#### 1.   Whether the ALJ's Findings That Plaintiff's Impairments Did Not Meet or Equal the Relevant Listed Impairments Were Based on Substantial Evidence

Plaintiff argues that the ALJ's decision that her symptoms did not meet or equal any of the relevant listed impairments was not based on substantial evidence. According to Plaintiff, "[t]he decision finds severe cervical and lumbar impairments, but then summarily rejects the Listings as a basis of disability at Step 3." (Pl.'s Br. 18.)

In his decision, the ALJ considered whether Plaintiff's limitations satisfied any of the relevant listed impairments. He found that "[t]he medical evidence indicates that the claimant has chronic cervical and lumbosacral strain, impairments that are 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (R. at 17.) In particular, the ALJ analyzed Plaintiff's claim with respect to listed impairments 1.04, 1.03, and

17

11.08.  (*Id.*)

In making her argument, Plaintiff does not argue that the ALJ failed to consider additional listed impairments that would also have been relevant.  The Court will therefore evaluate the ALJ's findings with respect to only the impairments that the ALJ considered.

### a.        Disorders of the Spine (Listed Impairment 1.04)

With respect to disorders of the spine, or medical listing 1.04, the ALJ stated that "there is no basis for finding that [Plaintiff's] orthopedic condition meet[s] medical listing 1.04 . . . ." According to the ALJ, "Dr. Donald documented that the claimant had no motor or sensory deficiencies," and there was "no evidence of spinal stenosis resulting in pseudoclaudication, spinal arachnoiditis, or other manifestations delineated in listing 1.04."  (R. at 17.)

To satisfy medical listing 1.04, a claimant must demonstrate, in addition to other criteria, "[s]pinal arachnoiditis," or "[l]umbar spinal stenosis," or "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test . . . ."  20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.04.  The ALJ correctly noted a lack of evidence in the record supporting a finding of any of these conditions.  Moreover, Plaintiff fails to identify in her brief any evidence showing that she suffered from these conditions. The Court therefore finds that the ALJ's findings that Plaintiff's condition did not meet or equal listed impairment 1.04 were adequately discussed and based on substantial evidence.

**b.** **Reconstructive Surgery or Surgical Arthrodesis of a Major Weight-Bearing Joint (Listed Impairment 1.03)**

The ALJ also discussed whether Plaintiff's condition satisfied the requirements for listed impairment 1.03, and found that "[t]here is no indication of any inability to ambulate effectively as required by [listing] 1.03, nor is there documentation of an inability to perform fine and gross movements effectively within the [definition] of listing 1.02B." (R. at 17.)

To satisfy listed impairment 1.03, a claimant must demonstrate an "inability to ambulate effectively . . . ." 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.03. Plaintiff testified, however, that she would take daily walks lasting approximately 15 to 30 minutes, at the recommendation of her doctor. (R. at 35.) Dr. Nkwonta's October 23, 2002 report also supports the ALJ's findings. According to Dr. Nkwonta, Plaintiff's gait was normal, she could walk on heels and toes without difficulty, and her stance was normal. (R. at 167.) Plaintiff's squat was full, and she did not require assistive devices. (*Id*.) Dr. Nkwonta further observed "[s]traight leg raising negative bilaterally," and "[f]ull range of motion of shoulders, elbows, forearms, and wrists bilaterally," as well as "[f]ull range of motion of hips, knees, and ankles bilaterally." (R. at 168.)

In arguing against the ALJ's finding, Plaintiff has not identified any evidence showing that she was unable to ambulate effectively for purposes of listed impairment 1.03. The Court therefore finds that the ALJ's findings that Plaintiff did not meet or equal listed impairment 1.03 were adequately discussed and based on substantial evidence.

**c.** **Spinal Cord or Nerve Root Lesions (Listed Impairment 11.08)**

The ALJ stated that "[a]dditionally, there is no substantiation for finding that medical

listing 11.08, which deals with spinal cord or nerve root lesions, is applicable herein" because there was "no evidence of any aphasia or disorganization of motor function."  (R. at 17.)

Listed impairment 11.08 is labeled as "[s]pinal cord or nerve root lesions, due to any cause . . . ."  20 C.F.R. Pt. 404, Subpt. P., App. 1 § 11.08.  To satisfy the requirements for listed impairment 11.08, the claimant must demonstrate "disorganization of motor function" consistent with 11.04(B).  *Id.*  That section, in turn, requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station."  *Id.* § 11.04(B).

In Dr. Nkwonta's October 23, 2002 report, Dr. Nkwonta noted that Plaintiff appeared to be in no acute distress.  (R. at 167.)  Plaintiff's gait was normal, she could walk on heels and toes without difficulty, and her stance was normal.  (*Id.*)  Plaintiff's squat was full, and she did not require assistive devices.  (*Id.*)  Plaintiff did not need help changing for the examination, getting on and off the examination table, or rising from the chair.  (*Id.*)  Dr. Nkwonta further observed "[s]traight leg raising negative bilaterally," and "[f]ull range of motion of shoulders, elbows, forearms, and wrists bilaterally," as well as "[f]ull range of motion of hips, knees, and ankles bilaterally."  (R. at 168.)  Dr. Nkwonta also found "[s]trength 5/5 in the upper and lower extremities."  (*Id.*)  According to Dr. Nkwonta, there were "[n]o evident subluxations, contractures, ankylosis, or thickening."  (*Id.*)  Plaintiff's "[j]oints [were] stable and nontender," and there was "[n]o redness, heat, swelling, or effusion."  (*Id.*)  Plaintiff's deep tendon reflexes were physiologic and equal in the upper and lower extremities, and there were no motor or sensory deficits noted.  (*Id.*)

Dr. Bram's May 13, 2003 report stated that Plaintiff "denie[d] any right upper extremity

symptoms," and there "[t]here [was] no change in Valsalva maneuvers."  (R. at 204.)  Dr. Bram

found that Plaintiff's motor skills were "[g]rossly within normal limits, no wasting noted, muscle

tone normal."  (R. at 205.)  Dr. Bram observed that, with respect to her neck, Plaintiff could "flex

and extend bilaterally, [and] can rotate the neck."  (*Id*.)  Dr. Bram found that "[t]here [was] no

lumbar paraspinous muscle spasm," "[n]o piriformis sinus tenderness," "[n]o pain on straight leg

raise, [and] no lower extremity edema noted."  (*Id*.)

Based on this record, the Court finds that the ALJ's determination that Plaintiff did not

meet or equal listed impairment 11.08 was adequately discussed and based on substantial

evidence.


### 2.  Whether the ALJ's Findings That Plaintiff Retained the RFC to Perform Her Past Relevant Work Were Based on Substantial Evidence

Plaintiff also argues that the ALJ's determination that Plaintiff retained the RFC to

perform her past relevant work was not based on substantial evidence.  According to Plaintiff, the

ALJ erred in three respects.  First, Plaintiff argues that the ALJ failed to identify the demands that

her past relevant work entailed.  (Pl.'s Br. 23.)  Second, Plaintiff argues that the ALJ's findings

are not based on substantial medical evidence because "[a]ll [the] treating and examining doctors

have confirmed the medical conditions that could reasonably be expected to cause the symptoms."

(*Id.* 20.)  Third, Plaintiff argues that her testimony concerning her impairments demonstrates that

she is unable to return to her previous work.  (R. at 20, 25-26.)  The Court will separately address

each argument concerning the ALJ's RFC findings.

> **a.** **Whether the ALJ Failed to Identify the Actual Demands of Plaintiff's Past Relevant Work**

Plaintiff argues that she does not have the RFC "for a full range of sedentary work due to pain, postural and manipulative limitations." (Pl.'s Br. 23.) According to Plaintiff, although the ALJ "found [that] she could do light work with some non-exertional limitations of a need for a sit and stand option," "[t]here is no evidence that these jobs allowed a sit and stand option." (*Id.*) Plaintiff claims that her symptoms "prevent sustained sedentary work on a regular and continuous basis." (*Id.*)

The ALJ noted that Plaintiff "has past relevant work as receptionist, data entry clerk, and typist." (R. at 19.) He further noted that Plaintiff "described her work duties as having to sit at a desk for up to six hours a day and perform data entry with no appreciable lifting or carrying requirements." (*Id.*) There is substantial evidence in the record supporting these findings.

For example, according to Plaintiff's testimony during the ALJ hearing, Plaintiff worked for approximately 9 months performing data entry and clerical office work at one particular job. (R. at 29.) That job involved both sitting at a computer and standing to perform such tasks as filing and copying. (*Id.*) Plaintiff also testified that she spent more than two years working at another office, where she performed a combination of accounts payable work and computer work. (R. at 30.) Plaintiff stated that these jobs were similar, and that she could perform such a job by alternating standing and sitting every 10 to 15 minutes. (R. at 57-58.) In her brief, Plaintiff has failed to identify any evidence demonstrating that she did not retain the RFC sufficient to perform her previous work.

Based on this record, the Court finds that the ALJ adequately considered Plaintiff's

previous work experience, and that there is substantial evidence supporting his findings with

respect to the demands of Plaintiff's previous jobs.

       **b.**      **Whether the ALJ's RFC Findings Concerning the Extent of Plaintiff's RFC Are Supported By Substantial Evidence**

      Plaintiff argues that the ALJ "disregard[ed] the medical evidence of treating doctors" and

that "he did have objective evidence of her impairments that reasonably could cause the subjective

complaints." (Pl.'s Br. 27.) According to Plaintiff, "[t]he medical evidence established that

[Plaintiff] had [] subjective complaints and non-exertional limitations and the ALJ was required to

consider this in determining disability." (*Id.*)

      In his decision, the ALJ found that "the evidence establishes that the claimant has the

capacity to [] function adequately to perform many basic activities associated with work." (R. at

19.) The ALJ noted that "it is evident that the claimant suffers from some limitations due to her

impairments, and as a result, her capacity to perform work is affected." (*Id.*) According to the

ALJ:

> [Plaintiff] has been unable to perform the lifting and carrying associated with
> work in the medium and more strenuous categories, but has had, at all material
> times, the residual functional capacity to perform the exertional demands of light
> work that involves lifting and carrying objects weighing 20 pounds occasionally;
> frequently lifting and carrying objects weighing up to 10 pounds; standing,
> walking and sitting up to six hours in an 8-hour workday with the option to sit and
> stand to alleviate pain and stiffness; pushing and pulling arm and leg controls.

(*Id.*) These findings are supported by substantial evidence in the record.

      For example, a Physical Residual Functional Capacity Assessment report completed on

December 4, 2002 ("RFC Report") supports the ALJ's findings concerning the extent of

Plaintiff's RFC.  (R. at 171-76.)  The RFC Report indicated that Plaintiff could occasionally lift

and/or carry a maximum of 50 pounds, and could frequently lift and/or carry a maximum of 25

pounds.  (R. at 172.)  It also indicated that Plaintiff could stand and/or walk, with normal breaks,

for a total of about 6 hours in an 8 hour workday.  (*Id.*)  The RFC Report stated that Plaintiff had

no limitations with respect to her ability to push and/or pull.  (*Id.*)  It also indicated that Plaintiff

did not have any postural, manipulative, visual, communicative, or environmental limitations.  (R.

at 173-74.)  The RFC report adopted Dr. Nkwonta's finding that Plaintiff was moderately

restricted in activities requiring heavy lifting, as well as prolonged sitting or standing, due to neck,

cervical, and lumbar pain.  (R. at 175.)

        Dr. Nkwonta's October 23, 2002 report also supports the ALJ's findings.  In describing

Plaintiff's daily activities, Dr. Nkwonta stated that she cooked, did limited cleaning and laundry,

shopped for food and clothing, showered, and dressed herself.  (R. at 166.)  According to Dr.

Nkwonta, Plaintiff appeared to be in no acute distress.  (R. at 167.)  Plaintiff's gait was normal,

she could walk on heels and toes without difficulty, and her stance was normal.  (*Id.*)  Plaintiff's

squat was full, and she did not require assistive devices.  (*Id.*)  Plaintiff did not need help

changing for the examination, getting on and off the examination table, or rising from the chair.

(*Id.*)  Dr. Nkwonta found that Plaintiff's "[l]umbar spine show[ed] full flexion, extension, lateral

flexion, and full rotary movement bilaterally."  (R. at 168.)  Dr. Nkwonta further observed

"[s]traight leg raising negative bilaterally," and "[f]ull range of motion of shoulders, elbows,

forearms, and wrists bilaterally," as well as "[f]ull range of motion of hips, knees, and ankles

bilaterally."  (*Id.*)  Dr. Nkwonta also found "[s]trength 5/5 in the upper and lower extremities."

(*Id.*)  According to Dr. Nkwonta, there were "[n]o evident subluxations, contractures, ankylosis,

or thickening."  (*Id.*)  Plaintiff's "[j]oints [were] stable and nontender," and there was "[n]o

redness, heat, swelling, or effusion."  (*Id.*)

Based on this record, the Court finds that there is substantial evidence supporting the

ALJ's findings concerning the extent of Plaintiff's RFC.

### c.     Whether the ALJ Failed to Consider Plaintiff's Testimony Concerning Her Subjective Impairments

Plaintiff argues that the ALJ erred by failing to adequately consider Plaintiff's testimony

concerning her subjective impairments.  According to Plaintiff, "[t]he RFC findings did not

include [Plaintiff's testimony concerning] daily chronic symptoms of pain, postural and

manipulative limitations, and the effect of obesity and medications" on her ability to work.  (Pl.'s

Br. 25.)  Insofar as the ALJ considered Plaintiff's testimony but found it to be not credible,

Plaintiff argues that the ALJ erred because the basis for his credibility findings concerned

testimony regarding "limited daily activities and other factual errors" that were "inadequate to

discount [Plaintiff's] testimony . . . ."  (*Id.* 26.)

In his decision, the ALJ stated that "[t]he objective and clinical findings do not document

the presence of impairments that would produce the severe functional [restrictions] that the

claimant alleged."  (R. at 18.)  According to the ALJ, "[d]espite her many allegations of severe,

disabling pain, [Plaintiff] has used few [medications], relying on over-the-counter medications."

(R. at 18-19.)  The ALJ observed that Plaintiff "alleged depression at the hearing, but has not

sought any treatment, not even from her primary care doctor."  (R. at 19.)  The ALJ acknowledged

that Plaintiff "ha[d] some limitations in her daily activities," but noted that she was "able to drive

a car and take public transportation and [took] care of her everyday functions at home by herself." (*Id*.)  The ALJ noted that Plaintiff "relate[d] constant, excruciating head, neck and back pain, but only [took] Advil or [Excedrin]."  (*Id*.)  Contrary to Plaintiff's argument, the ALJ adequately considered Plaintiff's testimony concerning her subjective impairments.

Moreover, the ALJ did not commit error in finding that Plaintiff was not disabled despite her testimony concerning her impairments.  In addition to the reasons that the ALJ provided, other evidence in the record provide further support for the ALJ's evaluation of Plaintiff's testimony. For example, in his December 27, 2001 medical report, Dr. Donald observed that Plaintiff "[had] mildly improved with her physical therapy," and that Plaintiff's symptoms "[were] significantly better related."  (R. at 189.)  According to Dr. Donald, Plaintiff "continue[d] to have residual symptoms of cervical and lumbosacral strain, although much improved from her initial pretreatment symptoms."  (*Id*.)  Contrary to the Plaintiff's claim of serious physical limitations, the record shows that Dr. Donald recommended physical activity in the form of "an independent exercise/gym program that she manages on her own . . . ."  (*Id*.)

Dr. Nkwonta's October 23, 2002 report stated that Plaintiff's "[l]umbar spine show[ed] full flexion, extension, lateral flexion, and full rotary movement bilaterally."  (R. at 168.)  Dr. Nkwonta observed "[s]traight leg raising negative bilaterally," and "[f]ull range of motion of shoulders, elbows, forearms, and wrists bilaterally," as well as "[f]ull range of motion of hips, knees, and ankles bilaterally."  (*Id*.)  Plaintiff's "[j]oints [were] stable and nontender," and there was "[n]o redness, heat, swelling, or effusion."  (*Id*.)  Although Dr. Nkwonta diagnosed Plaintiff with neck pain and low back pain syndrome, Dr. Nkwonta found that Plaintiff was only "moderately restricted in activities requiring heavy lifting, prolonged standing and sitting due to

26

the neck, cervical, and lumbar pain."  (*Id.*)

Dr. Bram's May 13, 2003 report provides further support for the ALJ's findings.  Dr. Bram observed that, with respect to her neck, Plaintiff could "flex and extend bilaterally, [and] [could] rotate the neck."  (R. at 205.)  Dr. Bram also found that "[t]here [was] no lumbar paraspinous muscle spasm," "[n]o piriformis sinus tenderness," "[n]o pain on straight leg raise, [and] no lower extremity edema noted."  (*Id.*)

For these reasons, the Court finds that there is substantial evidence supporting the ALJ's finding that, even in light of Plaintiff's testimony concerning her subjective impairments, Plaintiff was not disabled.


**III.   CONCLUSION**

For the reasons stated herein, Plaintiff's appeal is denied.  An appropriate form of order accompanies this Memorandum Opinion.


Dated:  December 29, 2006


                                        s/ Garrett E. Brown, Jr.
                                        GARRETT E. BROWN, JR., U.S.D.J.

27